John Federika and Catherine Federika v. Commissioner. John Federika v. Commissioner.
Federika v. Commissioner
Docket Nos. 42721, 42722.
United States Tax Court
T.C. Memo 1955-172; 1955 Tax Ct. Memo LEXIS 167; 14 T.C.M. (CCH) 652; T.C.M. (RIA) 55172; June 28, 1955
*167 Petitioner, a bookmaker, employed clerks who listed on daily sheets the details of each bet accepted. The details included the horse's name, amount bet, whether the bet won or lost, and the payoff amount on winning bets. The clerks totaled the wagers, payoffs, and expenses shown on their sheets, and computed a single figure for the day's net results. A net win figure represented the excess of wagers received over payoffs and expenses; a net loss figure represented the excess of payoffs and expenses over wagers. Each sheet was given to petitioner, who entered a single figure for the sheet, purportedly the net win or loss figure shown on the sheet, into his permanent record. Petitioner destroyed the detailed sheets and prepared his return from the figures he had copied into his record. Held, on the facts petitioner has not established that the losses recorded in his record were actually sustained; the amount of losses actually sustained determined. Held, further, no part of any deficiency is due to fraud with intent to evade tax. John Driskill, Esq., 2089 Sherman Avenue, Norwood, Ohio, for the petitioners. Charles R. Hembree, Esq., and Gene W. Reardon, Esq., for the respondent. HARRON *168 Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner has determined deficiencies in income tax and penalties as follows: Section
Section
Year
Deficiency
293(b)
294(d)
1947
$22,407.50
$11,203.75
$1,756.59
1948
23,386.65
11,659.32
4,479.68
1949
25,209.62
12,604.81
1,877.61
1950
24,130.48
12,065.24
1,579.01
One question to be decided is whether the petitioner realized taxable net income in each of the taxable years in excess of the amounts reported in his income tax returns. The deficiencies result from the Commissioner's determination that the petitioner failed to report all of his taxable income for each of the years. The second question to be decided is whether any part of a deficiency, if any, is due to fraud with intent to evade tax under section 293(b) of the Internal Revenue Code. Findings of Fact John Federika filed an individual income tax return for 1947 and 1948. He filed a joint return with his wife, Catherine, for the years 1949 and 1950. All of the returns were filed with the collector for the first district of Ohio. The questions to be decided relate to petitioner, John Federika, only, and, therefore, he is referred to hereinafter as the petitioner. The petitioner is a resident *169 of Cincinnati, Ohio. During the taxable years, petitioner operated various handbooks for the purpose of accepting bets on horse races, and he made bets on his own account. For about 2 1/2 months in 1949, petitioner also owned a small interest in the K.F. & P. Enterprise, a partnership which operated a handbook. The petitioner has been a bookmaker since approximately 1933, although the acceptance of bets on horse races through the operation of handbooks is illegal in Ohio. During the taxable years, he maintained an office in Norwood, Ohio, which is adjacent to Cincinnati. On business days, several bookmakers at locations in the surrounding area would accept wagers and call them in to petitioner's office by telephone. Petitioner had installed these bookmakers at their respective locations, usually in a restaurant or other place of business, after agreeing to pay the proprietor a rental for permission to take bets on the premises. With the exception of one bookmaker named Whitey, petitioner's understanding with these bookmakers during the taxable years was as follows: Petitioner would provide each with a sum of money, or "bank roll", depending in size on the amount of business done at *170 the bookmaker's location. The petitioner and the bookmaker were to divide evenly an amount equal to the profits from the wagering done at the bookie's location, less the cost of newspapers and racing forms purchased for the location, the cost of telephone service at the location, and the rent paid by petitioner to the owner of the premises. Petitioner and the individual bookmaker were to make weekly settlements, and if the operation of the location reflected a loss for the week, the amount of loss would be carried over to succeeding weeks until an over-all profit for a week was again shown. Under petitioner's arrangement with Whitey, the latter was to receive a commission on wagering done at his location in lieu of 50 per cent of the profits. In 1947, there were 10 bookmakers operating at locations provided by the petitioner; in 1948, 17; in 1949, 15; and in 1950, 13. The wagers called in by the various bookmakers were recorded at petitioner's office in the following manner: Petitioner employed between 4 and 7 clerks, or sheetwriters, at his office in Norwood. Each clerk was responsible for listing the bets called in from 1, 2, or 3 locations. A clerk maintained a 58-line yellow sheet *171 each day for each location from which he was taking phone calls. The clerk would write at the head of each sheet the nickname of the bookmaker at the location; the date; and the amount of expense to be charged the location for newspapers, racing forms, rent, and telephone. Expenses for newspapers and racing forms were charged each day; rent and telephone expenses were charged on the sheet for the day on which they were billed, generally once each month. The "58-line" sheet had printed six vertical columns. The first was for the name of the horse; the next three to indicate whether the horse was wagered to "win", "place", or "show"; the fifth to indicate whether the wager won or lost; and the sixth for the identifying number or letter assigned by the bookmaker to the bettor. When a bookmaker received a bet, he would call the clerk at petitioner's office who recorded his bets, give the clerk his nickname, the name of the horse, the amount of money and finish position wagered, and a code letter or number indicating the identity of the bettor. The clerk would write the name of the horse in the first column of the location's "58-line sheet," the amount wagered in the appropriate column *172 under "win", "place", or "show", and the code symbol for the bettor in the sixth column. The fifth column was left blank. When the race results and payoff prices were learned, this information was telephoned by the clerk to each of the locations for which he maintained a "58-line" sheet. The clerk informed the bookmaker of the payoff amount to be paid to the winning bettors, whose identifying initials or numbers he would read from the sixth column. In the event of a winning bet, or "hit", the clerk would circle the amount of money wagered, as recorded in the "win", "place", or "show" column and also record the total amount of the payoff in the fifth column of the "58-line" sheet. If the bet lost, a check mark was entered instead of the payoff amount. At the end of the day, the clerk would determine the profit or loss from the operation of the location by deducting the amount of expenses shown at the top of the page and the payoffs from the total amount wagered. If the total wagers exceeded the "hits" plus expenses, the "58-line" sheet showed a net "win"; if the total wagers were less than the "hits" plus expenses, a net "loss" was shown. The daily totals for wagers, payoffs, and expenses, *173 and the net "win" or "loss" for the location were computed on the "58-line" sheet. After the computations on the "58-line" sheet had been completed by the clerk and checked for accuracy by another clerk, the location was called and the bookmaker was told the amount of his net "win" or "loss" for the day. The system of having the "58-line" sheets filled out by clerks at his office was followed in the case of all but four of the bookmakers associated with petitioner. These four, petitioner's two brothers and two others, filled out "58-line" sheets for themselves each day. After the bookmakers were informed of the amount of their respective net win or loss for the day, the "58-line" sheets were given to the petitioner, who made entries from them into his permanent records described below. Petitioner retained the sheets for periods ranging from one day to 2 or 3 months, and occasionally longer, and then destroyed them. He retained the sheets in the first instance as a check in case a bettor claimed to have won a wager on a previous day. The sheets were destroyed because of their bulkiness and because petitioner feared that they could be used as evidence in proceedings against him growing *174 out of his bookmaking activities. During the taxable years, there were no raids by police on petitioner's office. Petitioner's permanent bookmaking record consisted of a three-hole loose leaf book containing more than 135 pages of paper with printed vertical and horizontal lines. One or more pages were allotted to each of the bookmakers with whom petitioner dealt, and the entires for each bookmaker were broken down by the year, week, and day. For each day on which the bookmaker operated, the petitioner entered the date and an amount on the page then current for the bookmaker. The amount entered purportedly represented the net result of the bookmaker's operations for the day. Thus a net "win" entered in petitioner's book purportedly represented the amount by which the wagers received by the bookmaker exceeded his payoffs and the expenses chargeable to his location for the day. A net "loss" figure purportedly represented the excess of expenses and payoffs over wagers received for the day. The bookmaker's daily totals for wagers, payoffs, and expenses, as recorded on the "58-line" sheet, were not separately entered in the petitioner's records. At the end of each week, the petitioner totaled *175 the bookmaker's "wins" and subtracted the total "losses" to determine a "split", which purportedly was the amount to be divided between the petitioner and the bookmaker from that week's operations. In the event the total "losses" for the week exceeded the total "wins", the net loss for the week, which the petitioner referred to as "in hole" or "barrel", was carried to the following week's operations, as follows: Allen
1948
Oct.
Win
Lose
4
$340.35
5
3.10
6
$ 64.65
7
31.40
8
55.05
9
165.45
$316.55
$343.45
316.55
$ 26.90 Barrel
11
$ 91.35
12
34.70
13
32.80
14
113.55
15
115.50
16
151.30
$504.50
$ 34.70
34.70
Win
$469.80
In Hole
26.90
Split
$442.90
A.P.P.D.
$221.45 Once each week, usually on Monday morning or Monday evening, the petitioner visited each of his locations to settle with the bookmaker for the prior week's operations. In the event there was a "split" or net profit for the prior week, he would receive cash from the bookmaker in an amount allegedly equal to one-half of the "split." The division of the "split" and payment of cash were indicated in petitioner's record by an entry with the initials "A.P.P.D.", recorded under the "split" entry. The designation "A.P.P.D." was used by petitioner to represent "A Piece Paid." *176 In the event there was a net loss for the week, the petitioner would restore the bookmaker's "bankroll." Petitioner would also replenish the "bankroll" during the week if the bookmaker required additional funds as a result of large payoffs. At the end of the year petitioner informed each bookmaker of the total "split" received by the particular bookmaker during the year. Petitioner recorded the daily and weekly entries described above for each of the bookmakers with whom he dealt during the taxable years except Whitey. The entries in petitioner's permanent records for Whitey are similar to those for the other bookmakers, except that there are no computations of "split", "A.P.P.D.", OR "BARREL" OR "IN HOLE." During the taxable years, the petitioner also wagered on horse races, on his own account, and in each of the years, sustained a net loss from these personal wagers. To record these wagers he used either a "58-line" sheet or an equivalent which he prepared himself. He did not destroy these sheets (referred to hereinafter as the "personal records"). During 1949, petitioner had a small interest in a partnership known as K.F. & P. Enterprise. K.F. & P. Enterprise was engaged in the *177 business of accepting wagers on horses and was located at petitioner's office. The petitioner did not keep the books and records for this partnership, and did not prepare or see the information return filed for its operations in 1949. The petitioner prepared his own returns for the taxable years. He listed his occupation on the nature of his business as "Sports Commissioner" or "Sports Commissions." On each return he reported only one figure for his bookmaking and wagering activities for the year. In 1947, this figure was referred to on petitioner's return as "net commissions"; for 1948, 1949, and 1950, the figure was reported in Schedule C, "Profit (or Loss) From Business or Profession" as gross receipts. He computed this figure by subtracting his net loss for the year from personal wagering, as shown on his retained personal records, from his share of the bookmaking earnings, as reflected in his looseleaf book. In computing the amount reported for 1949, he also included a loss of $1,895.07 from the operations of K.F. & P. Enterprise. The amounts reported by petitioner as net commissions or gross receipts are as follows: 1947
$24,418.80
1948
21,932.75
1949
28,410.90
1950
35,017.95 These *178 amounts were checked by respondent's agents against petitioner's permanent bookmaking record and the records of his personal betting, and were found to be mathematically correct. The amounts of petitioner's losses from personal wagers, determined by subtracting the "net commissions" or gross receipts figure in his returns from his share of the bookmaking profits, as computed from his bookmaking records, [1] *179 are as follows: 1947
1948
1949
1950
Net winnings - all
$110,000.65
$115,327.25
$96,141.20 n2
$68,881.30
Bookmakers
Less: Whitey's winnings
13,670.75
12,765.15
11,084.85
7,011.25
Other Bookmakers
$ 96,329.90
$102,562.10
$85,056.35 n2
$61,870.05
50 Per cent of other
$ 48,164.95
$ 51,281.05
$42,528.17
$30,935.03
bookmakers
Add: Whitey's winnings
13,670.75
12,765.15
11,084.85
7,011.25
Petitioner's share of
Net winnings from Book-
makers
$ 61,835.70
$ 64,046.20
$53,613.02
$37,946.28
Net Commissions or Gross
24,418.80
21,932.75
28,410.90
35,017.95
Receipts Reported
Losses
$ 37,416.90
$ 42,113.45
$25,202.12
$ 2,928.33
K.F. & P. Loss
1,895.07
Personal Betting Losses
$ 37,416.90
$ 42,113.45
$23,307.05
$ 2,928.33
The following schedule shows the income and expenses which the petitioner reported in his income tax returns for each of the taxable years: 1947
1948
1949
1950
Net Commissions or Gross
$24,418.80
$21,932.75
$28,410.90
$35,017.95
Receipts
Expenses
4,074.90
5,231.45
4,335.06
9,595.03
Bookmaking Income
$20,343.90
$16,701.30
$24,075.84
$25,422.92
Other Income
1,100.60
1,124.37
3,622.17
5,435.27
Total Income Reported
$21,444.50
$17,825.67
$27,698.01
$30,858.19
Net Income Reported
$20,944.50
$17,325.67
$26,698.01
$28,944.19
The Commissioner determined that the petitioner realized unreported income for each of the taxable years, in addition to the amounts reported in his returns, in the amounts set forth below: 1947
1948
1949
1950
Net Income per return
$20,944.50
$17,325.67
$26,698.01
$28,944.19
Unreported
35,385.40
40,565.76
49,738.04
45,700.42
Income per respondent
$56,329.90
$57,891.43
$76,436.05
$74,644.61 In the deficiency notices, the Commissioner stated that his determinations were made in accordance *180 with the provisions of sections 22(a) and 182(c) of the 1939 Code. The Commissioner did not give any other explanation for his determinations. In his amended answer, the respondent alleged that the petitioner, during each of the years 1947 through 1950, was individually and personally engaged in the operation of a handbook in and about the city of Cincinnati, Ohio, for the acceptance and making of bets and wagers on horse races run at various race tracks in the country; that the petitioner, during the taxable years, was also engaged as a partner in the operation of at least 15 handbooks located in and about Cincinnati, Ohio, for the acceptance and making of bets and wagers on horse races run at various race tracks in the country; that in the partnership enterprises, the petitioner provided the capital and his partner handled the booking of bets with customers, and that the profits from each operation were equally divided between petitioner and each partner during each of the taxable years; that no partnership returns were filed for any year, and no partnership books and records were made available to the respondent to show the correct income of each of the partnerships. The respondent *181 alleged, further, that the insufficiency of books and records with respect to the partnership income was due to wilfulness of the petitioner with the purpose of evading income taxes for the taxable years. The respondent, in making his determinations, disallowed losses which the petitioner purportedly sustained from his handbook operations, in the following amounts: Alleged
Year
Losses
1947
$35,385.40
1948
40,565.76
1949
45,568.64
1950
45,700.42
In addition to the disallowance of handbook losses in the amount of $45,568.64 for 1949, the respondent determined that petitioner realized additional income of $4,169.40 in that year from K.F. & P. Enterprise. Petitioner had included a loss of $1,895.07 from K.F. & P. Enterprise in computing his "gross receipts" for 1949. The respondent recomputed the net income of K.F. & P. Enterprise for 1949 by disallowing the daily net losses recorded on its retained records, and determined that petitioner realized income of $2,274.33, and not a loss, from that venture. In his amended answer relating to the year 1949, the respondent alleged that the petitioner and the firm did not maintain books and records which were sufficient to reveal the correct income of K.F. *182 & P. Enterprise during 1949, and that losses from its business were not substantiated by any adequate books and records. The respondent made no adjustments to petitioner's income with respect to any of the personal wagering losses which were recorded in petitioner's personal records and which entered into petitioner's computation of "net commissions" or gross receipts for each of the taxable years. The amounts of disallowed losses from handbook operations were computed by respondent from the figures recorded in the petitioner's permanent handbook record. The respondent added the total of Whitey's "losses" for the days on which the latter's operations resulted in daily net "losses", to 50 per cent of the total daily net losses for the other bookmakers, as follows: Total losses
Daily Net
Daily Net Losses -
disallowed and
Year
Losses -
Other Bookmakers
added to income
Whitey
1947
$13,284.15
$44,202.50
$35,385.40
1948
12,266.45
56,578.62
40,565.76
1949
20,060.10
51,017.07
45,568.64
1950
18,075.75
55,249.33 [3]
45,700.42
The respondent took into account only 50 per cent of the daily net losses entered in petitioner's record for a bookmaker named Mike, in computing *183 the daily net losses for bookmakers other than Whitey. The correct yearly totals of the daily net losses shown on petitioner's records, after adjustment for the percentages used by the respondent for the different bookies, are as follows: Daily Net
Whitey plus
Daily Net
Losses -
one-half
Respondent's
Other
Year
Losses -
Bookmakers
of others
Computation
Difference
Whitey
1947
$13,284.15
$41,133.10
$33,850.70
$35,385.40
($1,534.70)
1948
12,266.45
58,085.38 [4]
41,309.14
40,565.76
743.38
1949
20,060.60
57,531.03 [4]
48,826.11
45,568.64
3,257.47
1950
18,075.75
50,814.73
43,483.11
45,700.42
($2,217.31) The records kept by petitioner for his bookmaking business for the years 1941 to 1945, inclusive, were similar to those kept by him for the taxable years. His returns and records for the earlier years had been examined by respondent's agents, who did not advise petitioner that he should retain his daily "58-line" sheets; and that it was necessary to separately record each bookmaker's daily wins and losses; or *184 that his records were otherwise inadequate. The petitioner and his bookmakers sustained losses, in addition to the losses allowed by respondent, in the following amounts: From
From
Operations
Operations
of Other
Year
of Whitey
Bookmakers
1947
$7,900
$31,600
1948
6,000
39,000
1949
9,900
32,000
1950
9,000
28,700
No part of any deficiency in any taxable year is due to fraud with intent to evade tax. Since petitioner paid Whitey a commission and did not share gains and losses with him, petitioner sustained all of the losses from bookmaking operations of Whitey in the amounts set forth above. Petitioner shared profits and losses with all other bookmakers on an equal basis. Therefore, petitioner sustained losses from their operations to the extent of 50 per cent of the amounts set forth above. Accordingly, the petitioner sustained losses in the taxable years, on the basis of the above computations, as follows: [1]
50% of Losses of
Petitioner's
Year
Losses - Whitey
Other Bookmakers
Losses
1947
$7,900
$15,800
$23,700
1948
6,000
19,500
25,500
1949
9,900
16,000
25,900
1950
9,000
14,350
23,350
The total amount of losses from *185 bookmaking operations during each of the taxable years which are found above are based upon analyses of the retained abbreviated accounting records of the petitioner. The petitioner's operations with all bookmakers, including Whitey, resulted in at least one net loss day in each six-day period in each year. The numbers of net loss days in each year were at least the numbers set forth in the following schedule in column III; and the average amounts of losses on a losing day, in each year, were at least the amounts set forth in column VI of the following schedule. The losses in each year, expressed in round sums, were at least the amounts set forth in column VII of the following schedule, which amounts are the result of multiplying the figures in column VI by the respective figures in column III: [1] *186 Total
Total
Total
Average
days
1/6 of
losses on
loss days
loss on
per year
total
loss days
per year
loss days
Loss
Year
per books
days
per books
per books
per books
Sustained **
I
II
III
IV
V
VI
VII
Whitey
1947
309
15 1/2
$13,284.15
86
$154.47
$ 7,900
1948
314
52 1/3
12,266.45
106
115.72
6,000
1949
314
52 1/3
20,060.60
105
191.05
9,900
1950
317
52 5/6
18,075.75
106
170.53
9,000
Other Bookmakers *
1947
2,331
388 1/2
$46,897.35
576
$ 81.42
$31,600
1948
3,051
508 1/2
64,501.30
836
77.15
39,000
1949
2,921
486 5/6
60,961.65
914
66.70
32,000
1950
2,824
470 2/3
54,942.95
887
61.04
28,700
The petitioner is entitled to at least one and not more than one net loss day in each six-day period, and to at least and not more than the total losses in each year as found above. Opinion The principal issue to be decided is whether the petitioner understated his income in each of the taxable years in the amounts determined by the respondent. The petitioner also contests the 50 per cent penalty determined by the respondent for each of the taxable years under section 293(b) of the 1939 Code, and the additions to tax determined under section 294(d). Under the general issue, the question to be decided is a narrow one, namely, whether the petitioner sustained bookmaking losses in amounts in excess of bookmaking wins on as many business days as are set forth in his permanent bookmaking record, and whether the net losses on such days equaled the amounts recorded in his bookmaking record. The deficiencies determined by respondent are based on *187 the disallowance, for lack of substantiation, of these daily net losses recorded in petitioner's bookmaking record. The daily net loss total recorded in petitioner's permanent record is one of the items used by petitioner to compute his gross receipts or "net commissions." The other items which entered into his computation, namely, his daily net wins from bookmaking and his losses from personal wagering transactions, are not questioned by respondent. The respondent also has accepted the amounts of business expenses claimed as deductions from "net commissions" or gross receipts. The respondent's determination is prima facie correct, and the petitioner has the burden of proving that the claimed net losses were in fact sustained. Petitioner destroyed the detailed "58-line" sheets from which he allegedly copied the net loss figures into his records, and there is no evidence in the record other than his testimony to establish that he accurately transcribed any loss figures from the sheets, or the "split" figures, to his record book. We do not accept petitioner's uncorroborated testimony as proving that the daily net loss figures recorded by him establish the amount of any daily net losses *188 sustained in his bookmaking operations. This testimony was self-serving, at best, and we hold that petitioner has failed to prove that he sustained losses in the amount claimed. The respondent's determination implicitly allowed petitioner all bookmaking losses -3 sustained on days in which net wins were recorded, and on other days, losses equal to winnings. We are satisfied from the entire record, however, that the bookmakers with whom petitioner operated did experience days on which losses exceeded winnings, and we hold that the petitioner is entitled to losses, in addition to those allowed by respondent, in the amounts set forth in our Findings of Fact. In determining the amount of allowable losses, we have considered the entire record and have borne heavily against petitioner, whose failure to maintain adequate records resulted in this controversy. Cohan v. Commissioner, 39 Fed. (2d) 540; see also Jack Showell, 23 T.C. 495, on appeal, (C.A. 9). The petitioner was unable to establish, for each year, the respective amounts of gross receipts, gross winnings, and gross losses, because he failed to keep permanent books of account which were sufficient to establish the amounts of gross *189 income and other items as required by Regulations 118, section 39.54-1, which regulation was adopted by the Commissioner pursuant to section 54 of the 1939 Code. The Commissioner has not allowed the petitioner any losses on account of net loss days. However, in the light of petitioner's testimony that on some days bookmaking operations resulted in a net loss, we believe respondent's entire determination cannot be sustained, for each year, because he made no allowance for net loss days. We think it is reasonable, as well as probable, that petitioner's operations resulted in at least one net loss day out of every six-day period of operations. In so concluding, we bear heavily against petitioner whose incomplete records result from his own acts. In order to compute the amounts of losses sustained, in addition to what respondent has allowed, we have made analyses of the abbreviated accounting records of the petitioner, as the schedules in the findings show, and have made use of those accounting records. The amounts of losses so computed, which we hold are deductible, are approximations, of course, which are due to petitioner's failure to keep and retain adequate and complete accounting *190 records. Cohan v. Commissioner, supra.*
The petitioner also alleges that the respondent erred in increasing his share of K.F. and P. partnership income for 1949 in the amount of $4,169.40. Petitioner reported as his distributive share of K.F. and P.'s operations for 1949 a loss of $1,895.07, which respondent increased to a gain of $2,274.33. Petitioner had a small interest in K.F. and P., which was a partnership engaged in gambling activities. The books of K.F. and P. were not introduced in evidence. Petitioner testified that he paid $2,274.33 to an Irvin Khan and subsequently withdrew from the partnership after 2 or 3 months. Petitioner's testimony concerning the payment is uncorroborated. Moreover, there is no evidence indicating the details of the partnership's activities, the profit or loss from its operations during the time petitioner was a partner, or the reasons for which the alleged payment was made to Khan. On this state of the record, we hold that petitioner has not established that respondent's action in increasing his share of K.F. and P. income in 1949 *191 was erroneous. The respondent has determined 50 per cent fraud penalties for each of the taxable years, under the provisions of section 293 (b). The respondent has the burden of proving that part of any deficiency is due to fraud with intent to evade tax, and the evidence necessary to establish fraud must be clear and convincing. Snell Isle, Inc. v. Commissioner, 90 Fed. (2d) 481, certiorari denied, 302 U.S. 734; Wiseley v. Commissioner, 185 Fed. (2d) 263. The Finding of Fact that no part of any deficiency was due to fraud is dispositive of this issue. Respondent relies upon petitioner's deliberate destruction of the detailed 58-line sheets, which purportedly contained the substantiating data for petitioner's claimed net losses. The intentional destruction of these records no doubt suggests an intention to conceal the true facts concerning petitioner's losses, but under the circumstances of the case, it is also consonant with petitioner's desire to prevent the seizure, by police authorities, of evidence of his illegal bookmaking activities. An intent to evade tax is also negated by the fact that respondent's agents, in examining petitioner's returns for prior years, did not advise *192 him that the "58-line" sheets should be retained or that his records were otherwise inadequate. On the basis of the entire record, we have concluded that no part of any deficiency was due to fraud with intent to evade tax. The respondent determined additions to tax under sections 294(d)(1)(A) and 294(d)(2) for failure to file declarations of estimated tax and for substantial underestimates of estimated tax. The petitioner has introduced no evidence indicating error in respondent's determinations. Accordingly, the respondent's determination is approved. See Rene R. Bouche, 18 T.C. 144; G. E. Fuller, 20 T.C. 308, affd. 213 Fed. (2d) 102; and H. R. Smith, 20 T.C. 663. [1]
Decisions will be entered under Rule 50. Footnotes
1. The wins and losses for January 1, 1949, were apparently included by petitioner in his computation of income for the year 1948. n2 A summary of petitioner's bookmaking records introduced in evidence erroneously shows the 1949 "Net Wins" for a bookmaker named Joe as $16,753.50 instead of $14,499.00, and "Net Wins" for all bookmakers in 1949 as $98,395.70 instead of $96,141.20.
3. erroneously shown on respondent's summary as $35,249.33.↩
4. Petitioner erroneously included losses sustained on January 1, 1949, in his computation of daily net losses for 1948. Also, the total losses sustained by Joe in 1949 were incorrectly summarized by petitioner. Note 2, supra.↩
1. This paragraph was added by an official Order of the Tax Court dated October 18, 1955 and signed by Judge Harron.↩
1. This paragraph was added by an official Order of the Tax Court dated October 18, 1955 and signed by Judge Harron. a1 Includes all losses for "Mike" recorded in books. a2 Loss sustained is result of multiplying figure in column VI by figure in column III.↩
*. This paragraph was added by an official Order of the Tax Court dated October 18, 1955 and signed by Judge Harron.↩
1. This sentence was added by an official Order of the Tax Court dated October 18, 1955 and signed by Judge Harron.↩